1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  JUAN G. GALVAN,                          CASE NO. 1:10-cv-01822-BAM

10            Plaintiff,
                                            ORDER AFFIRMING AGENCY'S
11     v.                                   DENIAL OF BENEFITS AND ORDERING
                                            JUDGMENT FOR COMMISSIONER
12  MICHAEL J. ASTRUE,
    Commissioner of Social Security,
13
              Defendant.
14  _____/

15
16           Plaintiff Juan G. Galvan, by his attorneys, Christenson Law Firm, seeks judicial review of

17  the final decision of the Commissioner of Social Security ("Commissioner") denying his

18  application for disability insurance benefits under Title II of the Social Security Act (42 U.S.C. §

19  301 *et seq.*) (the "Act").  The matter is currently before the Court on the parties' cross-briefs,

20  which were submitted, without oral argument, to the Honorable Barbara A. McAuliffe, United

21  States Magistrate Judge.  Following review of the record as a whole and applicable law, this

22  Court affirms the agency's determination to deny benefits to Plaintiff.

**I.     Administrative Record**
23
    **A.     Procedural History**
24
25           Plaintiff was insured under the Act through December 31, 2008. On August 20, 2007,

26  Plaintiff filed for disability insurance benefits, alleging disability beginning November 10, 2005.

27  His claim was initially denied on February 7, 2008, and upon reconsideration on August 8, 2008.

28  Plaintiff appeared and testified at a hearing on January 13, 2010.  On February 11, 2010,

1   Administrative Law Judge Patricia Leary Flierl denied Plaintiff's application.  Plaintiff appealed

2   to the Administrative Council, which denied review on August 14, 2010.  Plaintiff filed a

3   complaint in this Court on October 1, 2010.

4          **B.      Agency Record**

5          **Plaintiff's testimony.**  Plaintiff (born November 23, 1958) worked as a live-in manager of

6   a group home for disabled persons.  His duties included preparing reports, preparing and serving

7   meals, and transporting residents to the doctor.  Plaintiff was laid off when he became depressed

8   and found it difficult to leave his bed and perform his duties.  Thereafter, he worked as a

9   dishwasher for a month and a half until he was fired.  Before 1995, Plaintiff worked as a laborer

10  in a citrus packing plant.

11         Plaintiff testified that he used to love to care for his yard but now was reduced to tears by

12  even a little time spent mowing the grass.  He no longer worked because he no longer wanted to

13  be around other people, who gave him anxiety attacks.  He no longer accompanied his wife and

14  daughter to social events, knowing that he would experience anxiety.  He no longer saw his

15  friends since they were "all druggies."

16         Plaintiff complained of anxiety, memory loss, and an inability to concentrate.  He was

17  being treated by Dr. Beber, a psychiatrist, who had diagnosed bipolar disorder.  Plaintiff also had

18  back problems that prevented him from lifting over fifty pounds as he had once been able to do.

19         On a typical day, Plaintiff awoke, cleaned the house, and woke his fifteen-year-old

20  daughter, for whom he prepared breakfast.  He was able to perform his own personal care, such as

21  dressing, showering, and shaving.  Plaintiff took his medication, which allowed him to function

22  by relieving his anxiety.  He could walk around the block but experienced sharp back pain if he

23  sat more than fifteen minutes.

24         Plaintiff denied having had a significant history of illicit drug use, but acknowledged that

25  he had used marijuana.  He had tried methamphetamine about ten years prior but did not like the

26  feeling.  He also testified that he last used meth five or six years before.  Confronted with the

27  contradictory time periods, Plaintiff claimed that he could not figure out exactly when he stopped

28  using meth.  He explained that he had been arrested with a small quantity of meth and had run

1  from the treatment program.  Several years later, he voluntarily appeared before the judge to
2  resolve his legal problems.

3       Plaintiff testified that he had used no illicit drugs for three years prior to the hearing,
4  initially because of court-ordered drug testing.  Expressing pride at being clean and sober, Plaintiff
5  was attending meetings to remain clean.

6       **Testimony of Plaintiff's wife.**  Rita Galvan had been married to Plaintiff for 26 years.
7  For the past four years, he demonstrated memory problems and difficulty concentrating.  His
8  depression had grown since he had lost, first, his job at the group home, then a job washing
9  dishes.  According to Mrs. Galvan, Plaintiff had developed problems working at the group home
10 because of his mental disability and his growing inability to function on the job.

11      To Mrs. Galvan's knowledge, Plaintiff was not currently using illegal drugs, although
12 before working at the group home, Plaintiff had used marijuana, cocaine, and methamphetamine.
13 She had never actually seen Plaintiff take any drugs.  She had been required to participate in the
14 rehabilitation program with Plaintiff.

15      Although Plaintiff's illness caused him to be angry and depressed, his current medications
16 (Seroquel, Prozac, and Abilify) helped him control his emotions so he could be around his family.
17 A prior medication had made Plaintiff suicidal.  Plaintiff was forgetful and had difficulty
18 concentrating.  He had difficulty being around people.

19      **Third Party Adult Function Report.**  In a report dated September 4, 2007, Mrs. Galvan
20 reported that Plaintiff rose early to attend NA meetings and church.  Sometimes he went to NA
21 social events.  Plaintiff had difficulty being around people and sometimes required
22 accompaniment to go outside.

23      Plaintiff was sometimes motivated to perform simple household chores but often just sat
24 and watched television.  A great deal of encouragement was needed to get him to do yard work.
25 He prepared simple meals but could no longer prepare full meals.  Although Plaintiff had no
26 problem with personal care, he sometimes lacked the motivation to bathe or shave.  He had
27 difficulty sleeping and had become less outgoing.  Plaintiff worried about his inability to provide
28 ///

for his family.   He could do the grocery shopping, but preferred not to shop for clothing.  He could pay bills and count change, but had difficulty handling a savings or checking account.

Mrs. Galvan opined that Plaintiff's impairments affected his ability to lift, squat, bend, reach, kneel, talk, remember, complete tasks, concentrate, understand, follow instructions, and get along with others.  He had experienced problems arising from anger toward his supervisors.  He had difficulty coping with stress and changes in routine.

By the time Mrs. Galvan filed a revised report on July 1, 2008, she no longer reported that Plaintiff was NA.  He continued to attend morning church services, depending on his mood.  Although he was still able to perform his own personal care, he no longer cared about how he looked, as evidenced by improper grooming and careless clothing selection.

Plaintiff lacked energy to perform yard work.  He struggled to handle household chores and required great amounts of encouragement.  He shopped only if he needed something and his wife could not go for it. His ability to concentrate on television was poor and he simply flipped the channels.  Plaintiff was angry and difficult to get along with.  Mrs. Galvan opined that Plaintiff's condition affected all of his abilities.  His attention span was very short, and he feared forgetting instructions.

**Plaintiff's Adult Function Report.**  Plaintiff's September 4, 2007 report was generally consistent with the first report prepared by his wife.  He too reported that he began his day by attending an NA meeting, followed by church.  His chores included laundry, cleaning, and mowing.  Plaintiff complained of a lack of motivation.  His condition affected his ability to speak, remember, complete tasks, concentrate, understand follow instructions, and get along with others.

Plaintiff's responses to his July 2, 2008 report were shorter and less detailed.  He no longer reported attending NA or church.  Although he once loved cooking, he now cooked only once a month.  He felt depressed and had no energy.  His wife handled his financial affairs.  Plaintiff reported that he had become afraid of people and thought of taking his life since he felt hopeless.

**Medical Records.**  Plaintiff's primary care physician was family practitioner Jasvir S. Sidhu, M.D., who had treated Plaintiff since at least 2000.  Dr. Sidhu and physician assistant Cynthia Rowell treated Plaintiff for numerous conditions, such as shingles, prostate problems, and

1   sinusitis, that are not relevant to Plaintiff's disability claim.  Similarly, the administrative record

2   includes other medical reports unrelated to Plaintiff's claimed impairments.  Those medical

3   records will not be discussed here.

4          On June 11, 2004, Plaintiff was treated in the emergency room of Sierra View District

5   Hospital following a fall in the shower at home.  Plaintiff complained of shoulder pain and

6   numbness, but denied neck or back pain.

7          On July 31, 2004, Plaintiff was again treated in the emergency room of Sierra View District

8   Hospital.  Plaintiff, who was withdrawing from methamphetamine, requested sleeping medication

9   and reported hallucinations.

10         On September 11, 2006, Rowell examined Plaintiff, who had been experiencing hip pain

11  for three weeks.  Rowell noted that Plaintiff, who had not been sleeping well, was experiencing

12  sadness, anxiety, mood swings, and suicidal thoughts.  Plaintiff's anxiety had increased by the

13  September 22, 2006 appointment.  Plaintiff reported that he had tested positive for Vicodin for

14  three months and was to be put into PAR (apparently, a drug rehabilitation program).[1]  Plaintiff

15  reported that he had stopped taking methamphetamine but had also tested positive for marijuana.

16  Rowell reassured Plaintiff and advised him to stop using illicit drugs.

17         On December 19, 2006, Rowell saw Plaintiff while he was on a pass from PARR.  Plaintiff

18  was doing well without suicidal or homicidal feelings, illicit drugs, or cravings.  Rowell wished

19  Plaintiff good luck at PARR and in his new job.

20         On February 6, 2007, radiologist Gregory W. Mellor, M.D., reviewed x-rays of Plaintiff's

21  lumbosacral region.  He identified an old anterior wedge compression fracture of vertebral body

22  T12 with surrounding osteophytes, decreased intervertebral space at L5-S1, and osteoarthritic

23  changes of the lumbosacral spine.  On March 5, 2007, Rowell noted that Plaintiff had pain and

24  tenderness in his rotator cuff and lumbosacral spine.

25         When Plaintiff saw Rowell on April 10, 2007, he was experiencing severe back pain and

26  was not sleeping.  Rowell noted that Plaintiff was limping.  By April 30, 2007, Plaintiff's back

27

28         [1] Rowell's notes refer to both PAR and PARR.

5

1  pain was worse, and he reported that he was unable to go to work.  Rowell prescribed Soma.  On

2  May 23, 2007, Plaintiff was still in pain but had discontinued Soma, saying it "wires me out."  AR

3  419.  Physical therapy was not helping.  Plaintiff requested Tylenol with codeine.

4          On June 6, 2007, Plaintiff requested that Rowell provide a note since his back pain had

5  caused him to miss two group meetings.  He was unable to start his new job, which required

6  physical labor.  Plaintiff had not kept his appointment with the orthopedist but continued physical

7  therapy twice weekly.  On June 21, 2007, Rowell switched Plaintiff from Tylenol with codeine to

8  Darvocet-N at bedtime due to his continued back pain.  On July 12, 2007, Rowell noted that

9  Plaintiff was seeing the orthopedist but had missed his meeting due to pain.

10         On July 25, 2007, Rowell noted that Plaintiff had seen the orthopedist for chronic back

11 pain. His anxiety had increased.  Plaintiff had twice missed counseling due to back pain.

12         On August 3, 2007, radiologist Thomas W. MacLennan, M.D., reviewed magnetic

13 resonance imaging of Plaintiff's lumbar spine.  He diagnosed degenerative disc disease at L5-S1,

14 but observed no significant acquired spinal stenosis.

15         On September 4, 2007, Plaintiff told Rowell that Trazadone was helping him.  Rowell

16 noted that Plaintiff had missed a group session on August 29, 2007.  On September 19, 2007,

17 Rowell noted that Plaintiff's back pain was increasing and referred him to a pain specialist.  On

18 October 31, 2007, Plaintiff complained of continued back pain and reported that his legs moved

19 while he was trying to sleep.  On November 14, 2007, Plaintiff again complained of back pain and

20 sleeping problems.

21         On January 2, 2008, Plaintiff reported continued sleep problems and requested an

22 antidepressant.  He was directed to do the back exercises prescribed by Dr. Von Kaenel, the pain

23 specialist.  On January 16, 2008, Plaintiff reported that he was still depressed and that he was

24 arguing with his wife.  He could not go to the pain specialist.  He had taken methamphetamine a

25 single time on Saturday night.  Rowell told Plaintiff to stop using methamphetamine, to go to his

26 support group, and to stay away from other meth users.

27         On February 19, 2008, Plaintiff told Rowell that things were looking up.  Although the state

28 had denied his disability application, Plaintiff had retained a lawyer.  Plaintiff told Rowell that he

1   could not work because he had back pain and was bipolar.  Plaintiff was starting to exercise.  He

2   also told Rowell that he could not stand to be around people.

3         Following a fall on February 28, 2008, radiologist Edgard Couri, M.D., evaluated x-rays of

4   Plaintiff's lumbar spine.  Although the x-rays revealed mild multilevel spondylosis with anterior

5   hypertrophic spurs, Couri saw no compression fracture.

6         On March 5, 2008, Rowell noted that Plaintiff reported that he had received a morphine

7   shot in the emergency room the prior week after falling in the bath tub.  Plaintiff had received a

8   probation violation notice, apparently for missing a probation appointment while home on bed rest

9   after the fall.  On March 25, 2008, Plaintiff told Rowell that he had returned to lifting weights.

10        On June 5, 2008, Plaintiff complained of chronic back pain, sadness, and anger.  On July 2,

11  2008, Plaintiff complained of sleep problems, anger, frustration, and suicidal thoughts.  Rowell

12  noted, "Must take Rx as directed!! Must see Psy!!"  AR 373.

13        On July 29, 2008, Plaintiff was evaluated by psychiatrist Jorge H. Beber, M.D., to whom

14  Dr. Sidhu had referred him.  Although Plaintiff's chief complaint was depression, Beber noted that

15  Plaintiff was depressed, tired, anxious, uncomfortable in crowds, had suicidal thoughts, lacked sex

16  drive, didn't want to talk to people, had mood swings, paranoia, and crying episodes.  Plaintiff had

17  paranoid delusions about his wife and thought people were watching him.  He may have

18  experienced auditory hallucinations.  Plaintiff had a history of drug abuse and was presently

19  subject to police testing.  He participated in NA and had a sponsor.

20        On August 13, 2008, Plaintiff told Rowell that he "like[d] Seroquel" but believed it was

21  interfering with his ability to urinate.  Rowell referred Plaintiff to a urologist.  On August 27, 2008,

22  Plaintiff reported that he could not afford to continue the Seroquel prescription and was again

23  having trouble sleeping.

24        Plaintiff saw Beber on August 14, September 3, and September 25, 2008, without

25  improvement.

26        On October 7, 2008, Rowell called Beber to request an earlier appointment for Plaintiff,

27  who was expressing increased suicidal thoughts and reporting symptoms of depression and

28  agoraphobia.

1   On October 17, 2008, Beber noted that Plaintiff was improving after Pristiq was substituted

2   for Sertraline, but that he was still having suicidal thoughts and hearing voices telling him to kill

3   himself.  On November 17, 2008, Plaintiff was worse, with increased hallucinations and suicidal

4   ideation.  Beber added prescriptions for Seroquel and Invega.  By December 19, 2008, Plaintiff

5   was again improving, feeling more energetic and driven despite continued hallucinations and

6   thoughts of suicide.  Beber increased the dosage of Invega.

7   Plaintiff became ineligible for coverage under Title II of the Act on December 31, 2008.

8   **Dr. Sidhu's Evaluation.**  On September 19, 2007, Dr. Sidhu and Ms. Rowell completed an

9   evaluation of Plaintiff's mental disorders.  They saw Plaintiff weekly to monthly.  Plaintiff's

10  diagnosis was bipolar disorder.  Medications included Trazodone,[2] Neurontin,[3] Resperdal,[4]

11  Darvocet-N,[5] and Motrin.[6]

12  Sidhu noted that Plaintiff's grooming and speech were good, his interview behavior and

13  motor activity were within normal limits, and his behavior disturbance was OK.  Plaintiff had

14  borderline intelligence and was easily distracted.  He was depressed daily, anxious three times a

15  week, and angry four times a week.  Plaintiff experienced auditory and visual hallucinations.  His

16  paranoia was evidence by his belief that other people were talking about his past and by his fear

17  that his wife had a lover.

18  ///

19  ///

20

21  [2] Trazodone is an antidepressant.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH000530 (September 26, 2012).

22  [3] Neurontin (Gabapentin) is an anti-epileptic medication that is also prescribed to alleviate pain resulting

23  from nerve damage.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH000940 (September 26, 2012).

24  [4] Resperdal (Resperidone) is an antipsychotic drug used to treat schizophrenia and bipolar disorder.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH000940 (September 26, 2012).

25  [5] Darvocet-N (propoxyphene napsylate and acetaminophen) is used to relieve mild to moderate pain.

26  www.fda.gov/downloads/Drugs/DrugSafety/UCM187067.pdf (September 26, 2012).  The FDA banned Darvocet-N and other drugs containing propoxyphene on November 19, 2010.  www.webmd.com/pain-

27  management/news/20101119/darvon-darvocet-banned (September 26, 2012).

28  [6] Motrin (ibuprofen) is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis. .  www.ncbi.nlm.nih.gov/pubmedhealth/PMH000598 (September 26, 2012).

Dr. Sidhu noted the following examples of Plaintiff's thought processing:

Sidhu:          If you live in [a] glass house, you shouldn't throw stones.
Plaintiff:      They will throw the stones back.

Sidhu:          [A] rolling rock gathers no moss.
Plaintiff:      It just keeps rolling.

AR 217.

Sidhu opined that Plaintiff had good ability to understand, remember and carry out simple instructions. He had fair ability to understand, remember, and carry out complex instructions; to maintain concentration, attention, and persistence; to perform activities within a schedule and maintain regular attendance; and to complete a normal workday and workweek without interruptions from psychologically based symptoms. Plaintiff had poor ability to respond appropriately to changes in a work setting.[7] Sidhu opined that Plaintiff was not capable of handling funds in his own best interest, noting that Mrs. Galvan handled the family's money.

Plaintiff had participated in court-ordered drug testing and had not abused drugs for the past nine months. In addition, Plaintiff received psychological treatment from Dr. Geshuri in Porterville. The administrative record includes neither medical records nor an evaluation from Dr. Geshuri.

**Dr. Izzi's Evaluation.** On November 4, 2007, as an agency consultant, psychologist Roger A. Izzi, Ph.D., conducted a comprehensive psychological examination and testing of Plaintiff. Plaintiff reported increased eating, sleeping difficulties, and unprovoked crying spells. He denied suicidal ideation, auditory or visual hallucinations, and a history of alcohol abuse. He reported using methamphetamine and marijuana from age 13 until 2003 when he stopped on his own. Plaintiff denied psychiatric hospitalization, reported that he had not consulted mental health professionals in the past four years, and stated that his internist prescribed his psych medications.

Plaintiff was alert and casually dressed and groomed. His affect was dysphoric (unhappy), and he reported feeling depressed. Plaintiff's thought processes flowed without looseness of

---

[7] According to the form's definitions, the patient's ability is good if the mental disorder does not significantly limit consistent and useful performance of the activity. The ability is fair if the patient's ability to perform the activity is impaired but the degree or extent of the impairment would require further description. Performance is poor when the patient cannot usefully perform or sustain the activity. *See* AR 218.

association.  He exhibited no apparent loss of contact with reality nor signs of psychosis or schizophrenia.

Izzi administered the Wechsler Adult Intelligence Scale III (WAIS III) on which Plaintiff, who appeared to put forth adequate effort, scored 75, verbal; 74, performance; and 72, full scale IQ, which put him in the borderline range of intelligence.  On the Bender Gestalt Test II, Plaintiff scored in the average range in copying drawings, but scored only in the seventh percentile on recall, suggesting memory problems.  Low results on the Wechsler Memory Scale III (WMS III) indicated difficulty with short-term memory (auditory immediate memory, 1st percentile; visual immediate memory, 2nd percentile; immediate memory, 3rd percentile; working memory, 1st percentile).  Plaintiff's performance on the Trail Making Test, Forms A and B, which measures visual scanning, visual tracking, and ability to process in sequence, suggested a moderate degree of impairment but not gross brain dysfunction.

Izzi diagnosed mood disorder NOS and borderline intellectual functioning.  He summarized:

> Clinical interview indicates that the claimant is not having any difficulty caring for basic hygiene.  The present evaluation suggests that claimant does appear capable of performing a simple and repetitive task on a consistent basis over an eight-hour period.  The irritability associated with his mood disorder may limit his ability to get along with peers or be supervised in a work-like session.  The deficits in short-term memory as suggested by the results of the WMS-III may limit his ability to perform a complex task on a consistent basis over an eight-hour period.  On a purely psychological basis, he appears capable of responding to usual work session situations regarding attendance and safety issues.  On a purely psychological basis, he appears capable of dealing with changes in a routine work setting.

AR 223.

**Mental Residual Functional Capacity.**  On January 18, 2008, agency psychologist P. Davis, Psy.D., assessed Plaintiff's mental residual functional capacity.  Dr. Davis opined that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting.  Davis summarized:

1    The clmt is able to understand, remember, & carryout simple & repetitive work
2    tasks.

3    The clmt is able to sustain his concentration, pace & his persistence w/simple &
     repetitive work tasks for 2 hr blocks of time over the course of a typical work
4    day/wk.  He'd be distracted by working around coworkers, so he should work in
     isolation.

5    The clmt can interact w/supervisors on all levels.  Coworkers and the general public
6    would see him as odd & difficult to interact w/.  He can perform simple & repetitive
     work tasks w/little/no public/coworker contact.

7    The clmt can successfully adapt to a work setting that is stable & predictable.

8    AR 227.

9         In performing the psychiatric review technique, Davis opined that Plaintiff had mild

10   restriction of activities of daily living, and moderate difficulties in maintaining social functioning

11   and in maintaining concentration, persistence or pace.  Plaintiff had no episodes of

12   decompensation.  In reaching these conclusions, the doctor relied on Plaintiff's regular attendance

13   at NA meetings and church services, and on his ability to shop, mow the lawn, and pursue other

14   activities in public.

15        **Dr. Beber's evaluation.**  Dr. Beber provided Plaintiff's attorney with a mental impairment

16   questionnaire and mental residual functional capacity assessment dated January 15, 2010.  Beber

17   diagnosed bipolar disorder and depression with psychosis.  Plaintiff's symptoms included

18   emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interest, paranoia or

19   inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating,

20   suicidal ideation or attempts, social withdrawal or isolation, and generalized persistent anxiety.

21   Noting that Plaintiff had tried several antidepressant and antipsychotic medications with limited

22   response, Beber opined that Plaintiff's prognosis was guarded.  He estimated that Plaintiff would

23   miss work more than three times each month due to his impairment or treatment.  Finally, Beber

24   opined that Plaintiff would have difficulty working at a regular job on a sustained basis because he

25   "has persistent anxiety, panic attacks, auditory hallucinations."  AR 455.

26        Providing a "current evaluation" of Plaintiff's mental residual functional capacity

27   assessment, Beber opined that Plaintiff was markedly limited in the ability to understand,

28   remember and carry out detailed instructions, to work in coordination with or proximity to others

11

1   without being distracted by them, to complete a normal workday and work week without

2   interruptions from psychologically based symptoms and to perform at a reasonable pace without an

3   unreasonable number and length of rest periods, to interact appropriately with the general public,

4   and to accept instructions and respond appropriately to criticism from supervisors.  Plaintiff was

5   moderately limited in his ability to remember locations and work-like procedures; to maintain

6   attention and concentration for extended periods; to perform activities within a schedule, maintain

7   regular attendance, and be punctual within reasonable tolerances; to sustain an ordinary routine

8   without special supervision; to get along with coworkers or peers without distracting them or

9   exhibiting behavior extremes; to respond appropriately to changes in the work setting; and to travel

10  in unfamiliar places or use public transportation.

11      **Vocational expert.**  Cheryl R. Chandler testified as vocational expert.  She characterized

12  Plaintiff's prior work as a packing house laborer and dishwasher as unskilled and medium.  The

13  group home job was akin to a program aide (skilled, SVP:6, and medium).

14      For the first hypothetical question, the ALJ directed Ms. Chandler to assume an individual

15  of the same age, education, and work history as Plaintiff.  The individual was limited to a light

16  exertional level and to simple, repetitive jobs with no interaction with the public.  Ms. Chandler

17  opined that such a person could not perform Plaintiff's prior work.  The hypothetical person could

18  work as a kitchen preparation worker (DOT 318.687-048, unskilled, light) with 15,900 jobs in

19  California, or a laundry worker (DOT 302.685-010, unskilled, light), 44,900 jobs in California.  In

20  each case, about nine times as many jobs were available in the United States as a whole.

21      For the second hypothetical question, the ALJ directed Ms. Chandler to assume the same

22  individual, except that he was limited to sedentary work and simple repetitive jobs with no

23  interaction with the public.  Ms. Chandler opined that such a person could work as a production

24  worker (DOT 700-684-014), 2800 jobs in California; material handler (DOT 529.287-138), 5300

25  jobs in California; or a hand packager (DOT 559.687-914), 3200 jobs in California.

26      For the third hypothetical question, the ALJ directed Ms. Chandler to assume that the

27  hypothetical person was limited to simple repetitive tasks; had a poor ability to work in

28  coordination with or proximity to other workers, who would distract him; and poor ability to

1 respond appropriately to supervisors and coworkers.  Ms. Chandler testified that no jobs would be
2 available for such a person.

3     For the fourth hypothetical question, Plaintiff's attorney directed Ms. Chandler to assume
4 that the individual was moderately limited in the following areas: ability to understand, remember,
5 and carry out detailed instructions; ability to work in coordination with or proximity to others
6 without distraction; ability to interact appropriately with the general public; ability to work with
7 co-workers or peers without distracting them or exhibiting behavioral extremes; and ability to
8 respond appropriately to changes in the work setting.  In response to Ms. Chandler's question, and
9 following discussion, Plaintiff's attorney defined moderately as "one-third to two-thirds."  Ms.
10 Chandler opined that no work would be available for such a person.

11 **II.     Legal Standards**

12     To qualify for benefits, a claimant must establish that he or she is unable to engage in
13 substantial gainful activity because of a medically determinable physical or mental impairment
14 which has lasted or can be expected to last for a continuous period of not less than twelve months.
15 42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of
16 such severity that he or she is not only unable to do his or her previous work, but cannot,
17 considering age, education, and work experience, engage in any other substantial gainful work
18 existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

19     To encourage uniformity in decision making, the Commissioner has promulgated
20 regulations prescribing a five-step sequential process for evaluating an alleged disability.  20
21 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following
22 questions:

23     Step one:     Is the claimant engaging in substantial gainful activity?  If so, the
              claimant is found not disabled.  If not, proceed to step two.
24
25     Step two:     Does the claimant have a "severe" impairment?  If so, proceed to
              step three.  If not, then a finding of not disabled is appropriate.
26     Step three:   Does the claimant's impairment or combination of impairments meet
              or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.
27            1?  If so, the claimant is automatically determined disabled.  If not,
              proceed to step four.
28

Step four:    Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:    Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date of November 10, 2005, through December 31, 2008, the date on which he was last insured.  His severe impairments were bipolar disorder, depressive disorder, history of substance abuse in remission, degenerative disc disease with chronic low back pain, and borderline intellectual functioning.  None of these impairments met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

Plaintiff retained the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently; to stand, walk, and sit six hours in an 8-hour work day; and to perform simple repetitive tasks.  Plaintiff could have no interaction with the public.  He could not perform his past relevant work as a packing house laborer, a dishwasher, or a program aide in a group home.  Nonetheless, jobs that Plaintiff could perform existed in significant numbers in the national economy.  The ALJ concluded that Plaintiff had not been under a disability from November 10, 2005, through December 31, 2008.

## III.    Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the

1    Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

2    evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g.,*

3    *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's

4    determination that the claimant is not disabled if the ALJ applied the proper legal standards and if

5    the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and*

6    *Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  "Where the evidence as a whole can support

7    either outcome, we may not substitute our judgment for the ALJ's." *Key v. Heckler*, 754 F.2d

8    1545, 1549 (9th Cir. 1985).

9    **IV.    Plaintiff's Credibility**

10           Citing Dr. Beber's January 2010 assessment as corroborating evidence, Plaintiff contends

11   that the ALJ erred in finding that Plaintiff's testimony lacked credibility.  The Commissioner

12   responds that the ALJ properly found Plaintiff's testimony to lack credibility since it was both

13   internally inconsistent and inconsistent with Plaintiff's activities of daily living.

14           An ALJ is not "required to believe every allegation of disabling pain" or other non-

15   exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*,

16   885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's pain testimony

17   after a medical impairment has been established, the ALJ must make specific findings assessing

18   the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and*

19   *Human Services*, 933 F.2d 735, 738 (9th Cir. 1991).  *See also Bunnell v. Sullivan*, 947 F.2d 341,

20   346 (9th Cir. 1991).  "[T]he ALJ must identify what testimony is not credible and what evidence

21   undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of*

22   *Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He or she must set forth specific

23   reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at

24   635. *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006).  The

25   credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did

26   not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir.

27   2002).

28   ///

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999) (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

Evaluating whether Plaintiff met the listing criteria for affective disorders, anxiety related disorders, and substance addiction disorders, Judge Flierl found that Plaintiff had mild difficulties in activities of daily living and social functioning, and that although he had moderate difficulty

16

1 │ concentrating, he had no episodes of decompensation.  She then proceeded to determine his

2 │ residual functional capacity, noting that she was required to assess a claimant's credibility

3 │ "whenever statements about the intensity, persistence, or functionally limiting effects of pain or

4 │ other symptoms are not substantiated by objective medical evidence."  AR 15.  After summarizing

5 │ the relevant evidence in the record, the ALJ concluded that although Plaintiff's medically

6 │ determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's

7 │ statements regarding the symptoms' intensity, persistence, and limiting effects were not credible.

8 │ In an extended discussion at AR17-18, the ALJ explained that Plaintiff's testimony was both

9 │ internally inconsistent and inconsistent with objective medical evidence and Plaintiff's reported

10 │ daily activities, stating:

> The claimant's statements are sometimes not consistent with statements he has
> made at other times and are not always consistent with his wife's statements.  For
> example, his claim to some of the doctors that he has been free of drugs for 5 years
> is not consistent with his wife's statement that she believes he was using drugs as
> late as 2007, and is inconsistent with his own 2007 statement to Dr. Sidhu that he
> had been clean for 9 months.  The claimant's statement to a doctor that he quit
> drugs on his own is not consistent with his statements and his wife's statements that
> he goes to church and to drug help meetings 4 days a week.  The claimant testified
> that he can lift fifty pounds and inconsistently testified that he can lift up to 30
> pounds.

AR 17.

The ALJ provided an explanation based on substantial evidence in the record for her

conclusion that Plaintiff's testimony was not fully credible.  She was not required to favor the

opinion of Dr. Beber, despite Plaintiff's preference for Beber's opinion.

**V.   Mrs. Galvan's Credibility**

Plaintiff contends that since the ALJ did not give reasons for rejecting Mrs. Galvan's

testimony, the ALJ erred in failing to adopt that testimony.  The Commissioner responds that Mrs.

Galvan's testimony was substantially consistent with the ALJ's determination and that any

inconsistency was harmless.

Judge Flierl summarized Mrs. Galvan's testimony at AR 15.  At AR 17, the ALJ noted

inconsistencies between Mrs. Galvan's testimony and that of Plaintiff.  She then proceeded to

///

1    discuss her decision in light of objective medical evidence and expert medical opinions of

2    Plaintiff's residual functional capacity.

3          "Lay testimony as to a claimant's *symptoms* is competent evidence which the Secretary

4    must take into account, unless he ultimately determines to disregard such testimony, in which case

5    'he must give reasons that are germane to each witness.'" *Nguyen v. Chater*, 100 F.3d 1462, 1467

6    (9th Cir. 1996), *quoting Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).  Friends and family

7    members who are in a position to observe the claimant's symptoms and daily activities are

8    competent to testify about their observations of the claimant's condition.  *Dodrill*, 12 F.3d at 918-

9    19.  An ALJ's disregard of the testimony of friends and family members violates the regulations,

10   which provide for consideration of the observations of non-medical sources regarding the effects of

11   the claimant's impairments on his ability to work.  *Id., citing* 20 C.F.R. § 404.1513(e)(2).[8]  *See*

12   *also Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  When a claimant alleges symptoms

13   that are not supported by medical evidence in the record, the agency directs the adjudicator to

14   obtain information about those symptoms from third parties likely to have such knowledge.  SSR

15   88-13.  The ALJ must give "full consideration" to such testimony.  *Id.*  Applicable law does not

16   require the ALJ to fully accept third-party testimony without regard to the record as a whole,

17   particularly objective medical evidence and expert medical opinion.

18         The ALJ carefully considered Mrs. Galvan's testimony in this case, particularly using it in

19   her efforts to assess Plaintiff's symptoms and daily activities in light of Plaintiff's internally

20   inconsistent testimony.  She noted that portions of Plaintiff's testimony were also inconsistent with

21   Mrs. Galvan's testimony.  In particular, the ALJ rejected Plaintiff's claims that he kept to himself

22   and was anxious around others in view of his testimony and that of his wife that he regularly

23   attended church and NA meetings.  The ALJ's determination was supported by substantial

24   evidence in the record.  Nothing more is required.

25   ///

26   ///

27

28

----

[8]  The relevant section is now designated 20 C.F.R. § 1513 (d)(4).

1    **VI.    Opinions of Dr. Sidhu and Dr. Davis**

2           Plaintiff criticizes the ALJ's analysis of medical opinions, specifically those of treating

3    physician Dr. Sidhu and agency physician Dr. Davis.  He contends that the ALJ erred in failing to

4    provide specific and legitimate reasons for rejecting Sidhu's opinion. He adds that the ALJ erred in

5    failing to adopt the opinion of state agency physician P. Davis since, in light of the vocational

6    expert's testimony, adopting Davis' opinion would have required the ALJ to find Plaintiff to be

7    disabled.

8           Physicians render two types of opinions in disability cases: (1) medical, clinical opinions

9    regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to

10   perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ is "not bound by

11   an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; S.

12   S. R. 96-5p.  The regulations provide that medical opinions be evaluated by considering (1) the

13   examining relationship; (2) the treatment relationship, including (a) the length of the treatment

14   relationship or frequency of examination, and the (b) nature and extent of the treatment

15   relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that

16   support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

17          Three types of physicians may offer opinions in social security cases: "(1) those who

18   treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the

19   claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant

20   (nonexamining physicians)." *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally

21   entitled to more weight than the opinion of a doctor who examined but did not treat the claimant,

22   and an examining physician's opinion is generally entitled to more weight than that of a non-

23   examining physician.  *Id.*  The Social Security Administration favors the opinion of a treating

24   physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A

25   treating physician is employed to cure and has a greater opportunity to know and observe the

26   patient. *Sprague*, 812 F.2d at 1230.  Nonetheless, a treating physician's opinion is not conclusive

27   as to either a physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d

28   ///

1 747, 751 (9th Cir. 1989). Although Sidhu was a treating physician and Davis was a nonexamining
2 physician, the analysis does not end there.

3    Once a court has considered the source of a medical opinion, it considers whether the
4 Commissioner properly rejected a medical opinion by assessing whether (1) contradictory opinions
5 are in the record; and (2) clinical findings support the opinions. The ALJ may reject the
6 uncontradicted opinion of a treating or examining medical  physician only for clear and convincing
7 reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 831. Even though the
8 treating physician's opinion is generally given greater weight, when it is contradicted by an
9 examining physician's opinion that is supported by different clinical findings the ALJ may resolve
10 the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). The ALJ must set forth a
11 detailed and thorough factual summary, address conflicting clinical evidence, interpret the
12 evidence, and make a finding. *Magallanes*, 881 F.2d at 751-55. The ALJ need not give weight to
13 a conclusory opinion supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111,
14 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.

15    Although an ALJ is not bound by uncontroverted opinions rendered by a plaintiff's
16 physicians regarding the ultimate issue of disability, he or she cannot reject them out of hand, but
17 must set forth clear and convincing reasons for rejecting them. *Matthews v. Shalala*, 10 F.3d 678,
18 680 (9th Cir. 1993). An ALJ must tie the objective factors or the record as a whole to the opinions
19 and findings that he or she rejects. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

20    Judge Flierl summarized the opinion of treating physician Dr. Sidhu and the treatment
21 notes from treating physician Dr. Beber, examining physician Dr. Izzi, and the agency medical
22 consultants at AR 15-17. She specifically examined Dr. Davis' opinion, which was designated
23 Exhibit 3F in the administrative hearing, at AR 16. The ALJ then included Davis' opinion with the
24 other materials prepared by the state agency physicians, giving them substantial weight since they
25 were consistent with the opinion of examining physician Izzi, on whom she relied. The ALJ wrote:

26    As for the opinion evidence, the doctors appear to agree that the claimant can
     perform at least simple repetitive tasks. The question is whether he can do so in the
27    context of a work place, and do so in 2 hour increments over an 8 hour work day
     and a 40 hour work week. The claimant's attendance at church and meetings 4 days
28    a week does show that he can get along with others on a routine basis. Within the

context of the claimant's daily activities, the report by Dr. Sidhu that he has only "fair" ability to maintain attendance and do other things regarding a work place seems inconsistent with the evidence.  If the doctor meant that the claimant can perform in the work place, but with some difficulty, then there is no disagreement among the medical professionals.  To the extent that the doctor's use of the word "fair" means that the claimant is unable to function adequately in a work situation, Dr. Sidhu's opinion is less consistent than are the reports of the State agency medical consultants and Dr. Izzi.  For that reason, I give little weight to the opinion of Dr. Sidhu.

I give significant weight to the opinion expressed by Dr. Izzi, who is a psychologist and who examined the claimant and administered several psychological tests.  His opinion that the claimant can perform at least simple repetitive tasks in a work place setting and for an ordinary work day and work week is consistent with the evidence as a whole.  This same opinion is expressed by the State agency medical consultants, who reviewed the entire record on more than one occasion.  I give substantial weight to the opinions of the State agency medical consultants also.

AR 17-18.

With regard to the physicians' opinions, the ALJ did precisely what is required by law: consider the record as a whole, comparing each physician's opinion with the opinions of the other physicians.  Judge Flierl's analysis of Dr. Sidhu's opinion comported with the requirements of 28 C.F.R. § 404.1527(d), paying due attention to the length and nature of Plaintiff's relationship with his primary care physician, acknowledging the largely consistent opinions of the physicians whose reports were in the record,[9] but finding Dr. Izzi's opinion more supportable in light of his specialization in psychology and his administration of a battery of diagnostic tests.  She then found the nonexamining state agency physicians' opinions to be consistent with Dr. Izzi's opinion as an examining physician, and also gave those opinions substantial weight.  She did not err.

The hearing decision is well-reasoned and supported by substantial evidence.  That Plaintiff would have construed the medical evidence differently is not sufficient grounds to set aside the ALJ's determination.

## VII.   Dr. Beber's Opinion

As previously noted, because Plaintiff did not submit Dr. Beber's opinion until after the ALJ had rendered her opinion, the ALJ did not consider it in the hearing decision.  Plaintiff argues that remand is appropriate to allow the ALJ to consider Beber's opinion.

---

[9]  Dr. Beber's opinion was not submitted to the Commissioner until after the ALJ had issued her opinion.  See Section VII *infra*.

1    At the hearing on January 13, 2012, Plaintiff testified that although he had provided Dr.

2 Beber with forms over a month before, Dr. Beber had not yet completed and returned them to

3 Plaintiff's attorney.  Plaintiff's attorney did not request that the record be held open to permit

4 submission of forms from Beber.  Beber's opinion was not submitted before the hearing decision

5 issued on February 11, 2010.

6    On April 6, 2010, Plaintiff requested that the Appeals Council review the hearing decision.

7 On April 29, 2010, Plaintiff submitted additional evidence, including Dr. Beber's mental residual

8 functional capacity assessment dated January 15, 2010.  The Appeals Council denied review on

9 August 14, 2010.

10    The Appeals Council will consider all the evidence in the administrative law judge hearing

11 record and any new and material evidence submitted to it which relates to the period on or before

12 the date of the administrative law judge hearing decision.  20 C.F.R. § 404.976(b)(1).  Beber's

13 opinion indicates that it was a current evaluation, not an evaluation as of the date that Plaintiff was

14 last insured.  *See* AR 448.  It is dated January 15, 2010, two days after the administrative hearing.

15 As such, the Appeals Council properly declined to consider it.  Remand is neither required nor

16 appropriate.

17 **VIII.   Conclusion and Order**

18    The ALJ's conclusions were supported by substantial credible evidence.  Accordingly, this

19 Court hereby AFFIRMS the agency's determination to deny Plaintiff disability benefits.  The Clerk

20 of Court is directed to enter judgment for Defendant Michael J. Astrue, Commissioner of Social

21 Security and against plaintiff.

22    IT IS SO ORDERED.

23 **Dated:   October 9, 2012**                       **/s/ Barbara A. McAuliffe**
                                                    UNITED STATES MAGISTRATE JUDGE